## UTICA MUTUAL INSURANCE COMPANY AND ANOTHER v. EMMCO INSURANCE COMPANY AND OTHERS.

243 N. W. 2d 134.

May 28, 1976—No. 45460.

---

*Faegre & Benson, James Fitzmaurice, John H. Hinderaker,* and *William E. Dorigan,* for appellant.

*Dean K. Johnson,* for respondent Utica Mutual.

*Lommen & Cole* and *John D. Lommen,* for respondent International Jet.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II,* and *James F. Roegge,* for respondent United States Fire Insurance Company.

*Coulter, Nelson & Sullivan* and *Mark Sullivan,* for respondent Marquette Agency.

*Barnett, Ratelle, Hennessy, Vander Vort, Stasel & Herzog* and *W. Scott Herzog,* for respondent Brookes-Shettle Agency.

*Richards, Montgomery, Cobb & Bassford, Jerome C. Briggs,* and *Lynn G. Truesdell III,* for respondent Joan W. Bennett, executrix of the estate of Donald V. Bennett.

Heard before Sheran, C. J., and Rogosheske, Peterson, Todd, and Yetka, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

Emmco Insurance Company (Emmco) appeals from an order denying its motion for amended findings or a new trial and from judgment entered in a declaratory judgment action determining that its insurance coverage was primary as to the liability of the operator of an airplane and of its pilot arising out of a crash, and that its coverage applied to claims against the operator and pilot by employees of Investment Dynamics Corporation (IDC) who were injured in the crash and to a claim on behalf of one employee who was killed. Emmco alleges that the pilot, Donald V. Bennett (Bennett), an employee of International Jet Division of Investors Growth Industries (Jet), was not qualified under the terms of its policy and that employees of IDC, named insured under the Emmco policy issued to B. B. G. Associates (BBG), the legal owner of the plane,[1] were precluded from recovery under an employee exclusion clause. We affirm.

IDC acquired a Lockheed Super Ventura (Ventura) for its business use in the spring of 1972. It then contacted Jet which agreed to provide hangar service for the plane and to furnish pilots. At the suggestion of Merle Brown (Brown), chief pilot for Jet, IDC contacted the Marquette Agency of Minneapolis (Marquette) regarding insurance on the Ventura. Marquette in turn contacted Brookes-Shettle Agency of Baltimore, Maryland (Brookes). Brookes in turn contacted Southern Marine & Aviation Underwriters (Southern) at their Atlanta, Georgia, office.

---

[1] Apparently legal title was placed in BBG, but the court and parties treated IDC as the owner of the plane.

Southern was the underwriter for Emmco, and all decisions as to granting of coverage and the form of the insurance policy were made by Southern.

Southern agreed with Brookes to bind liability coverage for $5,000,000 at a premium established by Southern. Brookes in turn advised Marquette, which obtained authority from IDC to place the insurance, and the communication process was reversed. Jet and IDC entered into a written agreement regarding their mutual obligations, including the scope of insurance protection which IDC was to provide for Jet and its employees. A copy was furnished to Marquette, which in turn provided copies for Brookes and Southern. Later, the policy prepared by Southern was delivered through the chain of agencies to IDC. An endorsement defined IDC as a named insured; pursuant to the agreement between Jet and IDC, another endorsement defined Jet as an additional named insured.

The agreement between IDC and Jet provided that Jet would furnish a qualified captain and copilot and would train an additional captain as soon as reasonably possible. Brown was a qualified captain and Bennett was selected by Jet to be trained as a qualified captain. Emmco's insurance policy provided an "open pilot" warranty for persons meeting the standards specified in the policy's pilot qualification endorsement. In July 1972, Marquette requested of Brookes that Bennett be designated as a qualified pilot. Through an error in Brookes' office, the request was misdirected and Southern claims it never received the request until after the accident in question. Accordingly, Bennett was never specifically endorsed on the policy, and is eligible for coverage thereunder only by compliance with the terms of the open pilot warranty.

Pursuant to its agreement with IDC, Jet commenced training Bennett to become a qualified captain of the Ventura. He received his Federal Aviation Administration (FAA) type rating in the Ventura aircraft and flew two trips as captain of the Ventura prior to the flight in question. On December 3, 1972, with

Bennett as captain, the Ventura crashed while on a flight to Tucumcari, New Mexico. Bennett, the copilot, and three passengers were killed, and six passengers were injured. Bennett and the copilot were employees of Jet; one of the deceased and three of the injured passengers were employees of IDC. Lawsuits were instituted against Jet and Bennett in Hennepin County District Court by the nine passengers involved in the accident, or their heirs, to recover damages for personal injuries or wrongful death. Emmco denied coverage as to these lawsuits, so this declaratory judgment action was commenced to determine the coverage question. The major issue at trial was whether Bennett met the specifications of the policy's pilot qualification endorsement.

The open pilot provision of Emmco's policy provided coverage only if, among other requirements not material, the pilot operating the aircraft had "*a minimum logged flying time of 5,000 hours as pilot in command.*" Bennett's pilot logbooks, which he was apparently carrying with him in the cockpit at the time of the accident, were destroyed by fire. Therefore, the issue of whether Bennett satisfied this requirement for coverage must be resolved by consulting other sources of information regarding his logged flying time. Evidence introduced at trial to reconstruct Bennett's flying time included documents he had prepared for Marquette and the FAA. Bennett had completed two pilot questionnaire forms, dated July 27, 1972, and November 27, 1972, for submission to Marquette, which in turn was supposed to forward these to Brookes and thence to Southern. Also, Bennett completed another form for the FAA on November 21, 1972, when he received a type rating approval for the Ventura aircraft following an FAA check ride.

All parties agree that Bennett had not *flown* as pilot in command, in the literal sense, for the requisite 5,000 hours. What is disputed is the extent to which other flying time could be *logged* as pilot-in-command time for purposes of satisfying the policy's pilot qualification endorsement. The lower court relied

on testimony of several witnesses, including an underwriter for Southern, that copilots could count 50 percent of their copilot time as pilot-in-command time. Bennett's reported flying times were not the same on each form, and he had made a mathematical error in totaling his time on the November 27, 1972, form. However, all parties concede that if the corrected November 27 form is used, and 50 percent of copilot time is counted as pilot-in-command time, Bennett would have had 5,007 hours as logged flying time as pilot in command. Furthermore, Bennett had additional flying time as pilot in command after November 27, 1972, which would have given him 5,028 hours as of the date of the accident.

The lower court adopted this total in its finding and also allowed additional hours for Bennett's military flying time since this had been logged on the basis of a "wheels up to wheels down" rather than a "block to block" measurement of time.[2] The lower court furthermore included 100 percent of Bennett's civilian copilot time to conclude that Bennett could have logged a total of 6,039.85 hours as pilot-in-command time as of the date of the accident. Based on these findings, the lower court ruled that Bennett was qualified under the Emmco policy's open pilot warranty. In addition, the lower court ruled that the claims arising out of injury and death of the passengers who were employees of IDC were not excluded from coverage because of the policy's employee exclusion clause, even though IDC was an additional named insured under the policy.

Emmco contends that the term "pilot in command" is self-explanatory, needs no definition in the policy, and is not ambiguous. Therefore, it contends, the term cannot be construed by the courts, nor should the lower court have received extrinsic evidence regarding the interpretation of the term by the aviation and insurance businesses. Emmco further contends that even if the term is ambiguous, the evidence does not justify a finding

---

[2] See Security Mutual Cas. Co. v. Luthi, 303 Minn. 161, 226 N. W. 2d 878 (1975), for an explanation of the difference.

that Bennett had more than 5,000 hours' pilot-in-command time so as to qualify under the open pilot warranty of the policy. Lastly, it contends that the lower court erred in failing to apply the employee exclusion clause to preclude coverage for the claims by the injured IDC employees and by the heirs of the IDC employee who died.

■ As to the first issue, Emmco has attemped to narrow the consideration of the policy terms to the words "pilot in command." We disagree. The open pilot warranty clause uses the words "has a minimum logged flying time of 5,000 hours as pilot in command." Neither this phrase nor the words "pilot in command" are defined in the policy. In Security Mutual Cas. Co. v. Luthi, 303 Minn. 161, 226 N. W. 2d 878 (1975), we had occasion to consider the term "logged flying time" when, as here, the term was not defined in the policy. We held the term was ambiguous so extrinsic evidence could be received to aid the court in its interpretation. In this case, we are dealing with the same general term, but focusing on a certain segment of total logged flying time, namely, that logged as pilot-in-command time. Brown's testimony that he had never seen a pilot's logbook which provided a space for recording pilot-in-command time was uncontroverted. This illustrates that the phrase did not necessarily convey a specific, widely accepted idea, as any term routinely used in logbooks must, for practical reasons, do. Bennett's differing computations of his pilot-in-command time on his various questionnaires, as well as the divergent testimony of witnesses for both parties, all ascribing different meanings to the term, underscore the fact that "logged flying time as pilot in command" is not a clearly defined term, even in the aviation and insurance businesses. This term is at least as ambiguous as the phrase "logged flying time" which we considered in Luthi. Therefore, we are in accord with the trial court's determination that the phrase "logged flying time as pilot in command" is ambiguous, and extrinsic evidence was properly received in order to interpret it. Having written and issued the policy in question, Emmco could

28

have defined "logged flying time as pilot in command" or specified the method of computation to be used. Its failure to do so permits a court to interpret the term in accordance with the custom and practice of the aviation industry.

The parties introduced testimony from several witnesses on the custom and usage in the aviation industry regarding the application of a certain amount of copilot time toward pilot-in-command time, as well as FAA regulations governing this practice. We have carefully reviewed this extensive evidence and are satisfied that the record sustains a finding that Bennett had more than 5,000 hours logged flying time as pilot in command. Therefore, coverage under the Emmco policy's open pilot endorsement was properly determined by the lower court. Its holding is not clearly erroneous when the entire record is considered. In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972); Rule 52.01, Rules of Civil Procedure.

■ The final issue on this appeal is whether the following exclusion clause in the Emmco policy operates to bar coverage of the claims asserted against Jet and Bennett by the three surviving IDC employees who were passengers at the time of the accident and the claim asserted on behalf of the heirs of the employee who was killed:

"THIS POLICY DOES NOT APPLY AND NO COVERAGE IS AFFORDED:
\*   \*   \*   \*   \*
"UNDER COVERAGES A, C AND D (BODILY INJURY)

"8.   To bodily injury to, sickness, disease or death of any employee of the insured while engaged in the employment of the insured \* \* \*."

The problem in interpretation posed by this exclusion is, who is "the insured" for purposes thereof? Emmco argues that where, as here, the persons seeking coverage are employees or derive their claims through employees of *any insured* (here IDC, a named insured), even though not of the *insured(s) claiming coverage* under the policy (here Jet and Bennett, additional in-

sureds), the exclusion applies and precludes coverage. Respondents argue, on the contrary, that the employee exclusion precludes coverage only for claims by persons who are employees of the particular insured who is seeking coverage, or who derive their claims through such employees.

In construing employee exclusion clauses, this issue has caused much difficulty for courts. See, Annotation, 48 A. L. R. 3d 13, 24:

"Seemingly the most difficult legal problem encountered by the courts in interpreting the employee exclusion clause, and one which has caused much controversy and confusion, involves the question of who is 'the insured' within [the] meaning of the clause. The problem arises essentially because the omnibus clause in the policy extends coverage to persons using the vehicle with permission of the named insured, * * * with the result that many persons are covered under the policy and may therefore be considered 'the insured,' * * *. Since the clause excludes injuries to employees of the insured, the most critical question arises as to whether the exclusion applies only when the injured person is an employee of the particular insured seeking coverage under the policy or whether it excludes coverage if the injured person is an employee of any insured party. * * *

"* * * On this question the courts appear to be in hopeless conflict, with some holding the exclusion inapplicable where the injured person was an employee of the named insured and an additional insured was the party seeking protection under the policy, and other courts taking a contrary position."

There appears to be a general unanimity among the courts that where either a named insured or an additional insured seeks coverage for injury to his own employee, the exclusion does apply. On the other hand, the courts generally agree that where one named insured seeks coverage for injury to an employee of another named insured, the exclusion does not apply.

The Minnesota cases are consistent with these holdings. No case of this court has allowed coverage under a policy contain-

ing an employee exclusion clause where an employee claims against his own employer. On the other hand, two Minnesota cases held that claims against a named insured for injury to an employee of another named insured were not barred from coverage by employee exclusion clauses. Motor Vehicle Cas. Co. v. Smith, 247 Minn. 151, 76 N. W. 2d 486 (1956); Minneapolis, St. P. & S. S. M. R. Co. v. St. Paul Mercury-Ind. Co. 268 Minn. 390, 129 N. W. 2d 777 (1964) (Soo Line). Soo Line explicitly distinguished the Smith case from an earlier Minnesota decision holding that an exclusion clause was applicable, Pearson v. Johnson, 215 Minn. 480, 10 N. W. 2d 357 (1943), on the ground that the party seeking coverage in Smith was a *named* insured, whereas the party seeking coverage in the earlier case was a mere omnibus insured. 268 Minn. 396, 129 N. W. 2d 782. Similarly, a case subsequent to Soo Line which denied coverage to an additional omnibus insured for injuries to an employee of a named insured, G. C. Kohlmier, Inc. v. Mollenhauer, 273 Minn. 126, 140 N. W. 2d 47 (1966), distinguished Soo Line on the ground that Soo Line involved a named insured. 273 Minn. 134, note 8, 140 N. W. 2d 52.

The situations which trouble the courts are those such as the one at hand: Where the insured seeking coverage is neither, on the one hand, an employer who is sued by his own employee so as to be clearly precluded, nor, on the other hand, a named insured who is specifically designated in the policy so as to be clearly covered. Such was the situation in the Kohlmier case, in which this court held that according to its "plain meaning", the employee exclusion clause barred coverage of *any* claim of an employee of *any* insured. However, other language in the Kohlmier opinion undercut that interpretation of the employee exclusion clause by acknowledging that the clause was never intended to deny the *named* insured protection when the injured party is an employee of another insured. 273 Minn. 130, note 3, 140 N. W. 2d 50.

Since the Kohlmier court stressed that its holding reflected "the manifest intentions of the *contracting* parties * * * *in this particular case,*" 273 Minn. 130, 140 N. W. 2d 49, the instant case can be distinguished from it on the basis of the intentions of the contracting parties herein. Moreover, because the Kohlmier decision is based on cases from other jurisdictions which are of very dubious precedential value, and because, upon consideration, we are not persuaded by the policy arguments therein, we overrule our holdings both in Kohlmier, and in a subsequent decision based upon the Kohlmier rule, Fuchs v. Cheeley, 285 Minn. 356, 173 N. W. 2d 358 (1969).

One factor which distinguishes the instant case from Kohlmier and indicates that the present parties intended the employee exclusion clause to preclude only claims by employees of the insured seeking coverage is that the instant policy, unlike the one in Kohlmier, contains a severability-of-interests provision. While it is true, as Emmco points out, that the unqualified word "insured" is broadly defined to include all persons and organizations insured under the policy, it does not follow that the word "insured" should be so broadly construed in the context of the employee exclusion clause. On the contrary, the severability clause dictates that the exclusion should be construed only with reference to the particular insured seeking coverage:

> "4. SEPARATE INSUREDS. The insurance afforded under the coverages set forth above apply *separately* to *each insured* against whom claim is made or suit is brought, * * *." (Italics supplied.)

Two distinguished authors on the subject of insurance law, Norman E. Risjord and June M. Austin, in *"Who is 'The Insured'" Revisited,* 28 Ins. Couns. J. 100, 101, view severability clauses as making explicit what they believed was always implicit in employee exclusion clauses, namely, that the word "insured" therein refers only to the particular person for whom coverage is then at issue:

"From a date at least no later than 1940, it was clearly understood by the insurance companies participating in the standard provisions program that * * * 'the insured' meant *only* the person claiming coverage, and that the employee exclusion denied coverage to *any* insured *only* with respect to injury to *his* employee. By 1954, a majority of the reported decisions was to the contrary. *Ironically, this is the only known situation where many of the courts persist in erring in favor of the insurance companies*!

"As a result, in 1954, the present writers, in 'Who Is "The Insured" ', asserted that 'the insured' was the *only* person claiming coverage. The 1955 revisions of the standard provisions promulgated by the National Bureau of Casualty Underwriters and the Mutual Insurance Rating Bureau carried a new condition labeled 'Severability of Interests', *intended to express the purpose formerly implied and to avoid further erroneous decisions on this subject.* The 1956 and 1958 standard *family automobile* policies and the 1959 *special* and *package* automobile policies (which largely supplanted the 1955 standard provisions for family-private passenger car risks) *expressed the purpose even more clearly*." (Italics supplied in part.)

A number of courts have explicitly based their holdings that an employee exclusion clause does not apply where the injured person was not an employee of the particular insured seeking protection under the policy in whole or in part upon the fact that the policy contained a severability-of-interests clause. See, Annotation, 48 A. L. R. 3d 13, § 29(a). Some courts, including this one, have declined to so interpret the impact of severability clauses on employee exclusion clauses, Fuchs v. Cheeley, 285 Minn. 356, 173 N. W. 2d 358 (1969); see, also, St. Paul Fire & Marine Ins. Co. v. Wabash Fire & Cas. Ins. Co. 264 F. Supp. 637 (D. Minn. 1967) (applying Minnesota law). The Fuchs decision was based upon the holding in Kohlmier, so our overruling of the latter herein obviously tolls the death knell for the former case as well. Furthermore, we conclude that the holding in Fuchs did not

logically follow from Kohlmier, where this court expressly noted that the policy being construed contained no severability-of-interests clause, 273 Minn. 128, 140 N. W. 2d 48. The implicit suggestion in Kohlmier that this court might interpret an employee exclusion clause more narrowly were a severability-of-interests clause also contained in the policy in question had been explicitly made in the Soo Line case, 268 Minn. 390, 398, note 6, 129 N. W. 2d 777, 783. Because we conclude that these dicta in former cases are consistent with the underwriting intent reflected in the severability clause and discussed in the passage by Risjord and Austin, *supra*, we overrule the holding in Fuchs that the severability clause should have no bearing on the interpretation of an employee exclusion clause.

In hereby overruling our holding in Fuchs, we follow the Supreme Court of Texas, which also reversed one of its prior decisions holding that a severability-of-interests clause did not limit the meaning of "insured" to the particular insured seeking coverage. The earlier Texas decision, Transport Ins. Co. v. Standard Oil Co. of Texas, 161 Tex. 93, 337 S. W. 2d 284 (1960), was reexamined and overruled in Commercial Standard Ins. Co. v. American Gen. Ins. Co. 455 S. W. 2d 714, 719, 48 A. L. R. 3d 1, 9 (Tex. 1970), where the court explained:

"Our decision in Transport * * * failed to give proper emphasis to the 'severability of interests' clause. This fact, accompanied by many subsequent decisions specifically interpreting this clause, lead us to a different result."

We could rest our decision here upon the severability-of-interests clause which distinguishes this case from, Kohlmier. However, because we conclude that the Kohlmier holding rested upon fundamentally flawed precedents, we overrule that decision as well. This weakness in the Kohlmier decision is highlighted by the following commentary on the case in Risjord and Austin's multi-volume treatise on insurance law:

"* * * [A]s respects the St. Paul [American Fidelity & Cas.

Co. v. St. Paul-Mercury Ind. Co. 248 F. 2d 509 (5 Cir. 1957)] and Standard Surety [Standard Surety & Cas. Co. v. Maryland Cas. Co. 281 App. Div. 446, 119 N. Y. S. 2d 795 (1953)] opinions so heavily relied upon by the Minnesota court here, the first has since been doubted by its author [Judge John R. Brown, see Brown & Risjord, *Loading and Unloading: The Conflict Between Fortuitous Adversaries*, 29 Ins. Couns. J. 197, 207 to 211, 216][3] and the second has twice since been repudiated by the highest court in its state [Greaves v. Public Service Mutual Ins. Co. 5 N. Y. 2d 120, 155 N. E. 2d 390 (1959); City of Albany v. Standard Accident Ins. Co. 7 N. Y. 2d 422, 165 N. E. 2d 869, 876 (1960)] * * *." 4 Risjord & Austin, Automobile Liability Insurance Cases, Case 3794, p. 4867.[4]

An additional factor undermining the precedential value of Judge Brown's decision in the St. Paul case, which was heavily relied upon by this court in Kohlmier, is that the Supreme Court of Alabama has resolved the employee exclusion issue contrary to Judge Brown's holding. St. Paul was a diversity case and Judge Brown was obliged to apply Alabama law. Judge Brown erroneously believed that the Alabama Supreme Court had considered the issue and had refused to allow coverage. The Alabama

---

[3] Judge Brown said: "If the courts would just *not* follow that alleged aberration of mine in *St. Paul,* things would return to a sound and simple status." 29 Ins. Couns. J. 216.

[4] This commentary further criticized the Kohlmier decision as follows: "The result * * * is contrary to the Underwriting Intent and * * * contrary to every known article on the subject *by insurance executives,* see Dykes, *The Underwriting Intent,* 25 Insurance Counsel Journal 27, 28 (January 1958 issue); Gowan, *Provisions of Automobile and Liability Insurance Contracts,* 30 Insurance Counsel Journal 96, 100, 105 (January 1963 issue); Risjord, *Recent Decisions, etc.,* 1963 Proceedings, Section of Insurance, Negligence and Compensation Law, American Bar Association 116-121; Risjord, *1964-1965 Highlights of Automobile Liability Insurance Law,* 16 Federation of Insurance Counsel Quarterly 5, 30-31, 33 (Winter 1965-66 issue)." 4 Risjord & Austin, Automobile Liability Insurance Cases, Case 3794, p. 4867.

Supreme Court later followed Judge Brown's lead and denied coverage in Michigan Mutual Lia. Co. v. Carroll, 271 Ala. 404, 123 So. 2d 920 (1960). But when later confronted with the liability issue where a severability-of-interests provision was involved, the court reached the opposite conclusion and forced the insurer to provide coverage. United States Fire Ins. Co. v. McCormick, 286 Ala. 531, 243 So. 2d 367 (1970).

This court has, on at least one previous occasion, reversed itself where the case authorities supporting a prior position have been overruled by the courts which authored such opinions. See, Anderson v. Florence, 288 Minn. 351, 181 N. W. 2d 873 (1970), reversing Ericksen v. Wilson, 266 Minn. 401, 123 N. W. 2d 687 (1963), and Hoffman v. Naslund, 274 Minn. 521, 144 N. W. 2d 580 (1966).

For the foregoing reasons, we affirm the trial judge's conclusion that the employee exclusion clause in the Emmco policy does not apply where, as here, the injured employees and the heirs of a deceased employee seek to recover from an insured who is not their employer.

Affirmed.